CENTURY FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff, *v.* HERMAN MERS et al., Defendants.

Supreme Court, Special and Trial Term, New York County, June 27, 1962.

*Remsen, Millham, Bowdish & Spellman* (*Richard F. Curran* and *William E. McCloskey* of counsel), for plaintiff. *Morris Pinsley* for defendants.

THOMAS C. CHIMERA, J. Apparently of first impression, this controversy is submitted on an agreed statement of facts pursuant to section 218-a of the Civil Practice Act and rules 304–306 of the Rules of Civil Practice (New York Simplified Procedure for Court Determination of Disputes).

Defendants mortgagors tendered to plaintiff mortgagee a so-called "homeowners policy" covering a number of unrelated risks in addition to the risk ordinarily covered by a "standard fire insurance" policy with extended coverage. The policy was rejected by plaintiff, the latter on its own initiative procuring successive "standard fire insurance" policies, paying the premiums and demanding reimbursement by defendants. Defendants continue to tender the "homeowners policy" and refuse to make the payments demanded.

The questions to be answered are (a) whether or not the tender of a "homeowners policy" to plaintiff by defendants complied with their obligation, set forth in the bond and mortgage, to keep the mortgaged premises insured against loss by fire; and (b) if not, whether two premium advances made by plaintiff are secured by the mortgage and collectible by plaintiff.

Among other covenants, the mortgage contains the usual clause requiring '' that the mortgagor will keep the buildings on the premises insured for the benefit of the mortgagee against loss by fire '' and such a clause, as the statute, subdivision 4 of section 254 of the Real Property Law, abundantly makes clear, requires the mortgagors, their heirs, successors and assigns to '' assign and deliver the policy or policies of such insurance to the mortgagee, his executors, administrators, successors or assigns, which policy or policies shall have endorsed thereon the standard New York mortgagee clause in the name of the mortgagee, so and in such manner and form that he and they shall at all time and times, until the full payment of said moneys, have and hold the said policy or policies as a collateral and further security for the payment of said moneys ''.

Plaintiff contends that the fire insurance policy required to be delivered by defendants, pursuant to the statute above cited in part, is the '' standard fire insurance policy of the State of New York '', so named, and particularly described in section 168 of the Insurance Law, even to the number of pages, to say nothing of the exact verbiage on each page. And much is made of the language of subdivision 2 of section 168, which seems to carry the stamp of inexorability — like death: '' 2. No policy or contract of fire insurance shall be made, issued or delivered by any insurer or by any agent or representative thereof, on any property in this state, unless it shall conform as to all provisions, stipulations, agreements and conditions, with such form of policy.''

Prior to 1949, only fire insurance companies were permitted to write fire insurance; casualty insurance companies were limited to casualty insurance, and marine companies to marine insurance. By chapter 667 of the Laws of 1949 (Insurance Law, § 311), enacted on the recommendation of the Joint Legislative Committee on Insurance Rates and Regulations with the approval of the Superintendent of Insurance and an enthusiastic Governor, fire, marine, casualty and surety companies were authorized to issue single-policy full-coverage insurance excluding only life insurance, annuities, title insurance and insurance of life and property, and the so-called '' homeowners policy '' thus came into being. *Today, nearly all, if not all of the States, have adopted similar legislation, and there is no evidence that such policies have ever been rejected by any mortgagee other than this plaintiff.*

The intent of the Legislature was clear and unequivocal. In the words of the Governor:

" One of the expected results upon the bill becoming law would be an increase in capacity, concerning the lack of which there has been much criticism of the industry. Making available the large surpluses of many companies by expanding their operations in all the fields of insurance will have the effect of increasing capacity. In addition, companies will have the advantage of spreading their risks over all the fields of insurance rather than to the limited specific classes of business which the present law permits.

" The advantages to the public and to American enterprise in general by the issuance of a single policy covering every type of risk, which this bill permits, as opposed to the present practice of requiring many policies to cover the same risks, cannot be underestimated. On the basis of the experience of foreign insurance companies this should result in savings which would redound ultimately to the benefit of the policyholder." (Public Papers of Governor Thomas E. Dewey [1949], p. 330.)

It is conceded that the policy tendered by defendants, among other clauses and coverages, generally follows the statutory form of the standard fire insurance policy.

In justification of its rejection, plaintiff raises eight objections to the policy tendered:

1. That the basic rights and duties of the parties rest solely in the bond and mortgage and in the statutory construction of these instruments which call for a standard fire policy *only* and that no new contract may be forced on plaintiff.

2. That there is no evidence whatsoever of any legislative intent to alter the pre-existing, fundamental, contractual and statutory rights between the parties as spelled out in such specific detail in subdivision 4 of section 254 of the Real Property Law, and section 168 of the Insurance Law, and the two statutes must continue to be construed together in the same manner as they were prior to 1949.

3. That the " homeowners policy " tendered by defendants covers many risks in addition to fire, and, since one premium covers all risks without apportionment, this policy is single and indivisible and therefore incapable of being assigned either as a fire policy alone, which it is not, or *in toto,* plaintiff having no insurable interest in the covered risks unconnected with the mortgage debt.

4. That since the " homeowners policy " calls for a total premium in three separate installments, if paid annually, upon default by defendants, plaintiff would be " committed to advance subsequent installment premiums covering risks unrelated to its mortgage ".

5. That it is "impossible" for a policy insuring an owner for risks wholly unrelated to a mortgage debt to be held "as a collateral and further security for the payment of said monies", and that such a policy is inconsistent with section 254 of the Real Property Law.

6. That the acceptance of the "homeowners policy" tendered by defendants would subject plaintiff to "risks, burdens and uncertainties never contemplated in the mortgage contract", among them:

(a) The policy must be retained at all times in a secure location by plaintiffs, to be produced as the best evidence of the insurance contract in any number of possible foreseeable instances of litigation between defendants and their carrier arising out of covered risks wholly unrelated to the mortgage debt, and, should an eventuality arise, plaintiff may be answerable to defendants in negligence, if it should lose or otherwise be unable to produce the policy.

(b) Plaintiff could be compelled by subpœna to deliver up the said policy in any situation such as above envisioned.

(c) In the event of a series of losses wholly unrelated to the mortgage debt, these burdens and uncertainties could be compounded, time-consuming, and even costly. Moreover, because of the extended Statute of Limitations in the case of personal injury claims brought by infants, plaintiff, who is merely a secured creditor, would be compelled to be the custodian of defendant's insurance records, in a given case, long after a specific "homeowners policy" has expired.

7. That having once accepted a single premium "homeowners policy", plaintiff has "committed itself to advance future premiums on the same basis" and its failure to do so could subject it to damages in negligence in the event that it does not keep the policy alive in its entirety, since the policy covers risks other than fire.

8. That the New York Standard Mortgagee Clause in section 7 of the Conditions, expressly requires plaintiff, on demand, to pay any premium which defendants may neglect to pay, and, since the premium on the "homeowners policy" is indivisible, plaintiff must pay the entire individual premium without any apportionment as between fire insurance coverage and any other coverages.

I agree with counsel for plaintiff that the rights of plaintiff arising out of the bond and mortgage as interpreted by subdivision 4 of section 254 of the Real Property Law, and section 168 of the Insurance Law, were in no way diminished by the

enactment of the Multiple Line Law (L. 1949, ch. 667; Insurance Law, § 311), and that it was the legislative intent that both statutes continue to be read together. We part company, however, on his conclusion that plaintiff need accept only the " Standard Fire Policy ", because, if the Legislature meant to accomplish anything at all by the later enactments, it meant to, and did provide for an alternative form of insurance policy, and so long as the alternative form includes all of the essential virtues of the " Standard Fire Policy ", plaintiff's basic rights are preserved and it cannot be heard to complain that a new contract is forced upon it.

Nor is it a valid argument to say that because the " homeowners policy " tendered provides for a single premium spread over fire coverage and many other risks wholly unrelated to the mortgage debt, that policy is not severable and therefore not assignable to plaintiff. Severability and assignability are related more to the nature of the agreement and the underlying intent of the Legislature and the parties to the insurance contract than to the leveling of separate premiums against separate risk coverages. *American Sur. Co. of N. Y.* v. *Rosenthal* (206 Misc. 485, affd. 1 A D 2d 652) cited by plaintiff's counsel in his brief, supports this conclusion rather than counsel's suggestion.

By the very purpose and nature of the " homeowners policy ", severability and assignability of the fire risk coverage feature are implicit. But even if this were not so, could anyone impressively argue, assuming the policy in force and the fire risk matured, that a mortgagee-beneficiary of fire coverage in this homeowners policy will not amply be protected according to his due?

Is plaintiff " committed to advance subsequent installment premiums covering risks unrelated to its mortgage "? Certainly not! Neither common sense nor section 7 of Endorsement M. P. B. 283 commit plaintiff to do so. Section 7 of the Endorsement, is no different from the Standard Fire Clause in plaintiff's Exhibits 3, 5 and 6, and its statutory interpretation must be the same in regard to defendant's failure to pay premiums. In such an event, plaintiff need not keep defendant's policy alive. It may " make such insurance from year to year, in an amount in the aggregate not exceeding one hundred per centum of the full insurable value of said buildings * * * for the purposes aforesaid, and pay the premium or premiums therefor, and * * * the mortgagor will pay to the mortgagee * * * such premium or premiums so paid, with interest from the time of payment, on demand, and that the same shall be

deemed to be secured by the mortgage, and shall be collectible '' (Real Property Law, § 254, subd. 4).

Having concluded this, what is there left of plaintiff's many other fears and trepidations? Why add controversy where none is reasonably to be expected!

It can be argued, of course, that the effect of this reasoning will be to roll back fire insurance coverage to worse than its original position, necessitating, as it will, the issuance of a second policy and a return to the wasted effort and increased cost so zealously sought to be avoided by the Legislature. *Need this be so when, with the adoption of a simple common-sense device, such an eventuality can be avoided?*

Since no one may seriously argue that the legislative act authorizing the '' homeowners policy '' was not overdue in our complex economy, all efforts should be aimed at convincing the industry and the New York State Superintendent of Insurance on the need for practical implementation of the legislative intent, at the very least, by devising a form of insurance policy which will retain the benefits of multiple line economies, and yet, by a simple detachable form with separate premium apportionment, on equitable terms, insuring to a mortgagee the privilege of keeping the fire coverage alive when a mortgagor fails to continue premium payments.

The first question having been answered in the affirmative, the second becomes academic.